UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EDWIN JAMES BITTNER, )<br><br>Plaintiff, )<br><br>v. )<br><br>OPTOS, INC., )<br><br>Defendant. ) | CIVIL ACTION NO. 04-12465-MLW |

## DEFENDANT OPTOS, INC.'S BRIEF IN OPPOSITION TO PLAINTIFF EDWIN JAMES BITTNER'S MOTION TO AMEND THE COMPLAINT

Defendant Optos, Inc. ("Optos") submits this brief in opposition to Plaintiff Edwin James Bittner's ("Bittner") Motion to Amend the Complaint. Bittner's original Complaint alleges a violation of the Family and Medical Leave Act ("FMLA"). Now, more than *ten months* after he filed this Complaint, more than *twenty-three months* since his employment with Optos ended and less than *nineteen days* before discovery ends, Bittner requests permission to add a claim for failure to pay overtime under the Fair Labor Standards Act ("FLSA"). Bittner's amendment threatens to seriously derail these proceedings, causing Optos significant prejudice on the eve of the parties' filing of dispositive motions. For these reasons, and those set forth below, Optos respectfully requests that the Court deny the Motion to Amend.

## I.    LEGAL STANDARD GOVERNING MOTIONS TO AMEND

Optos filed an Answer to Bittner's Complaint on December 21, 2004. It now opposes Bittner's Motion to Amend the Complaint. As a result, Bittner may amend his Complaint only by leave of court. FED. R. CIV. P. 15(a). The decision to grant leave to

amend a pleading is within the Court's sound discretion.  *See, e.g., Foman v. Davis*, 371 U.S. 178, 182 (1962).  Factors that generally warrant denial of leave to amend, either standing alone or in combination, include undue delay, bad faith or dilatory motive, prejudice to the opposing party and whether the proposed amendment would be futile.  *Id.* Virtually all of these factors are present in this case.  Most importantly, Bittner waited until the last minute to amend his Complaint and Bittner's own deposition testimony demonstrates that his FLSA claim is futile.  Therefore, Bittner's motion should be denied.

### A.    Plaintiff's Motion Should Be Denied Because Of His Undue Delay And The Resulting Prejudice To Defendant Optos

Bittner's motion should be denied because of his undue delay in asserting this new claim.  Where allowing an amendment will cause further delay in the proceedings and require a reopening of discovery with additional costs, courts may deny a party's request to amend.  *See Acosta-Mestre v. Hilton Int'l of Puerto Rico, Inc.*, 156 F.3d 49, 52 (1st Cir. 1998) (denying motion to amend where request was filed near the close of discovery); *Grant v. News Group Boston, Inc.*, 55 F.3d 1, 5 (1st Cir. 1995) (amendment denied where additional discovery would be required, trial preparation was underway and amendment would likely change defendant's planned trial strategy and tactics).

Bittner's explanation for the extreme lateness of his Motion to Amend is unpersuasive.  In trying to justify his delay, Bittner's attorney contends that it only "became apparent" that Bittner had a claim against Optos for failure to pay overtime at Bittner's August 10, 2005 deposition.  *See* Plaintiff's Motion to Amend the Complaint, ¶ 2. This assertion is specious.  Any reasonable investigation or simple communication between Bittner and his attorney would have "uncovered" this information long ago.

The foundation of any overtime claim involves an analysis of two components: (i) the duties of the employee's job to determine whether he or she is exempt or non-exempt under the FLSA; and (ii) the amount of hours the employee has worked. Given that the original Complaint alleges the unlawful termination of Bittner's employment under the FMLA, any reasonable investigation of his claims by counsel would have included some communication about the type of job Bittner held and his general responsibilities. Moreover, the long hours Bittner worked at Optos was an issue for him and he alleged at his deposition that he complained about his hours to numerous co-workers and managers, a fact which Bittner's attorney knew or reasonably should have known a year ago. Bittner's work schedule is also apparent from documents *provided by* him during discovery. Bittner provided 106 pages of expense forms, which detailed extensive travel for frequent business trips. In other words, no new information came to light at the deposition and both Bittner and his counsel were aware of the alleged facts supporting the proposed FLSA claim at the time the original Complaint was filed. Bittner should not be rewarded now for his lack of diligence in preparing his Complaint.

Motions to amend are routinely denied where the plaintiff could have asserted the new theories at the outset of the litigation, but simply failed to do so through a lack of due diligence or reasonable investigation. *See Quaker State Oil Ref. Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1517 (1st Cir. 1989) (parties seeking the benefit of Rule 15(a)'s liberality have an obligation to exercise due diligence); *Bell v. Allstate Life Ins. Co.*, 160 F.3d 452, 454 (8th Cir. 1998) (denying leave to amend because of prejudice to the defendants in having to reopen discovery on new substantive claims and because the only reason for the untimeliness of the motion was plaintiff's lack of due diligence); *Kaplan v. Rose*, 49 F.3d

1363, 1370 (9th Cir. 1994) (leave to amend properly denied where the plaintiff was aware of the alleged facts supporting the additional cause of action at the outset of the litigation).

The predictable result of Bittner's delay is that Optos is now prejudiced in the defense of its case. Prejudice is shown where, as here, a considerable amount of time has passed between the filing of the original complaint and the motion to amend, and the proposed amendment significantly alters the nature of, and shifts the direction of, the litigation. *See, e.g.*, *Quaker State*, 884 F.2d at 1518 (majority of discovery had already taken place without reference to the new claim, thus prejudicing the non-moving party).

Bittner's proposed "new" cause of action under the FLSA involves an entirely separate and distinct theory of liability, a different set of facts and legal issues and different witnesses and documents than are relevant to Bittner's FMLA claim. The FMLA claim focuses on the reasons for Bittner's involuntary termination of employment. While there was some background examination at Bittner's deposition about the nature of his job, the primary focus of the questioning was on Bittner's relationship with his supervisor and co-workers and the grounds for his termination. The proposed FLSA claim, on the other hand, requires a detailed examination of the job duties of a Field Service Engineer, the position held by Bittner and others at Optos, the number of hours Bittner actually worked while employed at Optos and his method of compensation.

Discovery ends on October 31, 2005, and Optos is now in the position of proceeding to trial and/or moving for summary judgment having had no discovery regarding Bittner's FLSA claim. Bittner's delay of nearly one year in seeking to amend, as well as the prejudice to Optos caused by the need to reopen discovery to address Bittner's

4

FLSA claim, warrant denial of leave to amend at this late juncture.[1]

**B.    Plaintiff's Proposed Amendment Should Be Denied Because His FLSA Claim Is Futile**

Courts deny motions to amend as futile in circumstances where the proposed new claim could not survive a motion for summary judgment. *See Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (leave to amend denied as futile where proposed new claim created no triable issue of fact so that defendant would be entitled to summary judgment). Bittner's FLSA claim is foreclosed because his position as a Field Service Engineer falls within the Motor Carrier Exemption, 29 U.S.C. § 213(b)(1), to the overtime payment requirements under the FLSA. 29 U.S.C. § 201, *et seq.*

This Court recently held that Field Service Engineers who routinely travel in interstate commerce in order to perform maintenance, service and repair work were exempt from the FLSA's overtime requirements. *See Harrington v. Despatch Indus.*, No. 03-12186-RGS, 2005 U.S. Dist. LEXIS 12781 (D. Mass. June 29, 2005) (attached hereto as Exhibit A). In *Harrington*, the Field Service Engineers spent only three percent of their time operating a vehicle in interstate commerce; however, because travel was an integral part of their job and they transported tools and spare parts across interstate lines, their job duties impacted the safety of interstate motor transportation and the Motor Carrier Exemption applied. *Id.* at *17 n.6, 19; *see also Friedrich v. U.S. Computer Servs.*, 974 F.2d 409, 410, 413 (3d Cir. 1992) (Field Service Engineers were not entitled to overtime pay where they transported toolkits, replacement parts and equipment in interstate commerce to further the company's commercial enterprise).

---

[1] As a result, if the Court grants Bittner's Motion to Amend, Optos will respectfully request an appropriate extension of the discovery period in order to conduct proper discovery into the overtime claim.

Although Bittner's deposition did not explore his job duties within the specific context of the FLSA, it is impossible to ignore that what little testimony Bittner did provide on the subject demonstrates conclusively that his job as a Field Service Engineer fell within the Motor Carrier Exemption to the overtime requirements. (Attached hereto as Exhibit B is a true and accurate copy of excerpts of Bittner's August 10, 2005 deposition testimony.) Similar to the employees in *Harrington*, Bittner was required as a Field Service Engineer for Optos to travel to customer sites to perform equipment maintenance and repairs.[2] In the course of his extensive travel, Bittner carried a company toolkit for the express purpose of servicing Optos' medical/ophthalmic equipment.[3] Whereas the Field Service Engineers in *Harrington* spent only three percent of their time traveling, in Bittner's own words, he was "traveling almost constantly." *See* Exhibit B, Deposition of Edwin James Bittner, page 175:8. The territory he covered included the Pacific Northwest

---

[2]    Q.    And what were you made to believe the responsibilities of a field service engineer were going to be? Exhibit B, Deposition of Edwin James Bittner, page 74:23-24, page 75:1.

       A.    Installation, service, maintenance, calibration, updating of the Panoramic 200, the product line including the Panoramic 200, customer relations, customer interfacing. Ex. B, p.75:2-5.

       A.    [Bittner reading from his Performance Review] "Jay's major accountabilities as a Field Service Engineer are providing professional, quality and timely customer support to customers including but not limited to on-site installations, preventative maintenance, repairs and upgrades to the satisfaction of the customer." Ex. B, p.304:5-10.

[3]    A.    Well, I have a big Dodge truck and I had a lot of parts in the back of my truck for troubleshooting the equipment. As all field engineers do it's called a trunk kit. Ex. B, p.302:4-7.

and Canada.[4]  As such, Bittner's claim for overtime pay under the FLSA cannot survive a

motion for summary judgment because there is no genuine dispute of material fact.  Thus,

Bittner should not be permitted to include a new allegation that would not only require

additional discovery, but would also result in a waste of the parties' and the Court's time

and resources.

## II.    __CONCLUSION__

For the foregoing reasons, Defendant Optos respectfully requests that the Court

deny Plaintiff's motion for leave to file a First Amended Complaint.

---

[4]
|     |     |
| --- | --- |
| Q. | So the first three or four months, what territory did you work? Ex. B, p.76:3-4. |
| A. | I was all over the West Coast.  I went to I believe it was Mississippi or Georgia.  I came back to Boston once to do an install back here.  I did a lot of travel.  *Id.*:5-8. |

|     |     |
| --- | --- |
| Q. | What did Dennis Nilan tell you three or four months into your job the parameters of your territory were going to be?  *Id.*:14-16. |
| A. | I believe at the time it was Northern California, Oregon.  I had Utah, Wyoming, Montana, Washington State and any installs going into Canada. *Id.*:17-19. |

|     |     |
| --- | --- |
| Q. | What did you tell Mr. Nilan about your concerns with respect to the parameters of the territory?  Ex. B, p.78:8-10. |
| A. | I told him I could not keep up.  *Id.*:11. |
| Q. | What did you mean by that?  *Id.*:12. |
| A. | I mean it was too much work to go from Montana to Oregon to Canada in one day and still try to get seven hours sleep.  The area was physically a very large area with a large number of machines that required a lot of maintenance.  *Id.*:13-17. |
| Q. | How did Mr. Nilan respond?  *Id.*:18. |
| A. | He took away Utah, Wyoming, Northern California and Southern Oregon. *Id.*:19-20. |
| Q. | Leaving you with what?  *Id.*:21. |
| A. | Montana, Northern Oregon, Washington and Canada and Idaho.  *Id*:22-23. |
| Q. | Did you approve of this realignment of your territory?  *Id.*:24, Ex. B, p.79:1. |
| A. | It was better, yes.  *Id.*:2. |

Respectfully submitted,

OPTOS, INC.,

By their Attorneys,

Adam P. Forman (BBO #560360)
Erin M. Reid-Eriksen (BBO #661075)
Littler Mendelson, P.C.
One International Place
Suite 2700
Boston, MA  02110
Tel.:  (617) 378-6000

Dated:  October 12, 2005

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served upon counsel for the plaintiff by mail on this 12th day of October 2005.

Erin M. Reid-Eriksen

Firmwide:80502783.1

8

# EXHIBIT A

LEXSEE 2005 U.S. DIST. LEXIS 12781

**KEVIN C. HARRINGTON v. DESPATCH INDUSTRIES, L.P.**

**CIVIL ACTION NO. 03-12186-RGS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

*2005 U.S. Dist. LEXIS 12781*

**June 29, 2005, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee sued defendant employer, alleging that the employer failed to pay him overtime wages in violation of the Fair Labor Standards Act (FLSA), *29 U.S.C.S. § 201* et seq., and the Massachusetts Minimum Fair Wage Law (MFWL), Mass. Gen. Laws ch. 151 et seq. The employee moved for summary judgment on his FLSA claim, and the employer moved for summary judgment on both claims.

**OVERVIEW:** The employee worked as a service technician for the employer, which sold industrial ovens. The employee traveled to customer sites in Massachusetts and also made some trips to other states. The employer had encouraged the employee to become more involved in sales, but a majority of the employee's time was spent on service and repair work. The court found that the employee did not fall within the administrative exemption under the FLSA, *29 U.S.C.S. § 213*(a)(1), as he invariably spent more than half of his time on service and repair work and he had no supervisory authority. However, the Motor Carrier Act of 1935 (MCA) exemption under *29 U.S.C.S. § 213*(b)(1) was applicable; the employee transported "property" (tools and spare parts) in interstate commerce. The "primary business test" of *49 U.S.C.S. § 13505* was inapplicable to the MCA exemption, there was no de minimis exception to that exemption, and a week-by-week analysis under *29 C.F.R. § 782.2(b)(3)* was inapplicable because the employee drove in interstate commerce in the ordinary course of his work. Any viable claim under the MFWL was preempted by the MCA.

**OUTCOME:** The employer's summary judgment motion was granted. The employee's summary judgment motion was moot.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For Kevin C. Harrington, Plaintiff: Jeffrey M Sankey, Law Office of Jeffrey M. Sankey, Mansfield, MA.

For Despatch Industries, Defendant: Robert M. Hale, Goodwin Procter, LLP, Boston, MA.

**JUDGES:** Richard G. Stearns, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Richard G. Stearns

**OPINION:**

MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

STEARNS, D.J.

Plaintiff Kevin Harrington brought this action against his employer, Despatch Industries, LP (Despatch), seeking payment of overtime wages under the Fair Labor Standards Act (FLSA), *29 U.S.C. § 201, et seq.* and the Massachusetts Minimum Fair Wage Law (MFWL), *G.L. c. 151, et seq.* On October 29, 2004, the parties filed cross-motions for summary judgment. Harrington seeks summary judgment on the FLSA claim only, while Despatch moves for judgment on both claims, arguing that Harrington is an "exempt" employee under the "administrative" exemptions of the FLSA and the *Motor Carrier Act (MCA) of 1935*.

Despatch is a Minnesota limited partnership whose primary line of business is the manufacture, sale, and servicing of industrial ovens. In 1992, Harrington was hired by Despatch as its New England Field Service [*2] Engineer. On being hired, Harrington was told that in addition to his work as a service technician, he would share responsibility for the growth of the company's New

Case 1:04-cv-12465-MLW    Document 18    Filed 10/12/2005    Page 11 of 24

Page 2
2005 U.S. Dist. LEXIS 12781, *

England business. Despatch's employment letter explicitly stated that Harrington was being hired as an "exempt" employee. Harrington understood this to mean that he would be paid an annual salary, rather than an hourly wage. n1 That understanding did not, however, discourage Harrington from making persistent requests of Despatch for overtime pay.

n1 That Harrington was paid an annual salary is not in dispute, although the parties disagree over the exact amount. Harrington lists his annual earnings as $ 62,361.83 for 2000, $ 65,230.36 for 2201, and $ 66,722.71 for 2003 (he does not provide a figure for 2002). Despatch claims that Harrington has taken his figures from the wrong box on his W-2 forms and that the accurate salary figures are $ 74,589.63 for 2000, $ 77,806.36 for 2001, and $ 79,309.36 for each of 2002 and 2003.

Despatch provides Harrington [*3] with a four and one-half ton Chevrolet van to travel to customer sites. The van is equipped with tools, test equipment, and spare parts. Despatch (or a vendor) regularly ships parts to Harrington at his home in Massachusetts for delivery to its customers. While most of Despatch's customers are based in Massachusetts, Harrington drove a total of 231 hours calling upon customers in other New England states during the three years preceding the filing of the lawsuit.

In addition to its own staff, Despatch contracts with Certified Service Representatives (CSRs) to perform customer service and repair work. The CSRs work as independent contractors. Harrington typically accompanies a new CSR on his or her initial customer calls. To track time spent by employees on service and repair work, Despatch uses a "direct utilization rate." The rate is calculated by dividing the number of hours the employee records for these jobs by 40 hours. For the period June 2000 through July 2001, Despatch set a direct utilization goal of 65 percent for Harrington. In June of 2001, Harrington's job title was changed to Field Service Account Manager. For the period June 2001 through June 2002, Harrington's utilization [*4] goal was 65 percent, while his actual utilization rate was 80 percent. From June 2002 through June 2003, the goal was 65 percent, and the actual rate was 85 percent. From May 2003 through April 2004, the goal was 69 percent, while the actual rate was 64 percent.

Over time, Despatch has encouraged Harrington to become more involved in sales and to delegate as much of his service work as possible to the CSRs. At one point, Despatch told Harrington that it expected him to spend up to 60 percent of his time marketing its products and services. By all accounts, Harrington is a highly successful employee. Despatch acknowledges that he "handles customers masterfully" and has been instrumental in the growth of its New England business. The dispute is not over the quality of Harrington's work as an account manager or as a service technician. The dispute is over whether Harrington is an exempt employee under either the FLSA or the MCA (or both statutes). If he is not, Harrington claims that he is owed 1406.5 hours in overtime pay. n2

n2 While the issue is not discussed in the parties' briefs, the FLSA statute of limitations is two years (three if the employer's violation was willful). 29 U.S.C. § 255(a). See McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 100 L. Ed. 2d 115, 108 S. Ct. 1677 (1988). The MFWL also contains a two-year statute of limitations. G.L. c. 151 § 20A. While Harrington's overtime claim is based on the three-year statute of limitations, he makes no allegation of willfulness on Despatch's part.

[*5]

DISCUSSION

Under the FLSA, an employer is required to compensate employees who work overtime at a rate not less than one and one-half times their regular hourly wage. (Overtime is defined as hours worked in excess of a 40-hour work week. See 29 U.S.C. § 207(a)(1)). If, however, the employee falls within one of the FLSA exemptions for managerial (salaried) employees, the employer is not required to pay overtime.

1. The Administrative Exemption

Employees working in a "bona fide executive, administrative or professional capacity," are exempted under the FLSA. 29 U.S.C. § 213(a)(1). The employer bears the burden of proving that the exemption applies to an employee who is denied overtime. See Reich v. Newspapers of New England, Inc., 44 F.3d 1060, 1070 (1st Cir. 1995). Department of Labor (DOL) regulations specify either a "long" or a "short" test for determining whether an employee is exempt. See 29 C.F.R. § 541.2. Because Harrington at all times earned more than $ 250 per week, his employment is governed by the short test. Under this test, an employee is exempt if his primary duty (1) [*6] "consists of the performance of office or non-manual work directly related to management policies or general business operations of the employer or the employer's customers"; and (2) "includes work requiring the exercise of discretion and independent judgment." 29 C.F.R. § 541.214. (Emphasis added).

DOL interpretive regulations "subdivide the first prong of the short test into two subparts: (1) the employee must be engaged in administrative' rather than production' activity; and (2) this administrative activity must be of substantial importance' to management or operations." *Reich v. John Alden Life Insurance Co., 126 F.3d 1, 8 (1st Cir. 1997)*, citing 29 C.F.R. § 541.205(a). "The administrative operations of the business include the work performed by so-called white-collar employees engaged in servicing' a business as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." 29 C.F.R. § 541.205(b). While "applying the administrative-production dichotomy is not as simple as drawing the line between white-collar and blue-collar workers," *John Alden Life Ins. Co., 126 F.3d at 9*, [*7] it is evident from the undisputed utilization rates that Harrington's primary duties are those of a repairman and service technician.

DOL regulations provide that "in the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time." *29 C.F.R. § 541.103*. n3 Harrington invariably spent more than half of his time on manual service and repair work. He trained as a repairman, and it was in that role that he gathered a following among his customers. "Perhaps the most frequent cause of misapplication of the term discretion and independent judgment' is the failure to distinguish it from the use of skill in various respects." n4 29 C.F.R. § 541.207(c).

N3 I recognize that the First Circuit has cautioned against slavish adherence to the regulation, as "primary" should be read as meaning "principal," rather than "over half," and because a person is capable of managing others while physically doing something else. See *Donovan v. Burger King Corp., 672 F.2d 221, 226 (1st Cir. 1982)*.

n4 Discretionary acts are those "characterized by [a] high degree of discretion and judgment involved in weighing alternatives and making choices with respect to . . . policy and planning. . . . Discretionary acts are not those which involve the carrying out of previously established policies or plans.'" *Whitney v. Worcester, 373 Mass. 208, 218, 366 N.E.2d 1210 (1977)*.

[*8]

While conceding that Harrington devotes a substantial part of his time to the performance of services and repairs for customers, Despatch argues that this is Harrington's personal choice and not a job requirement. Despatch maintains that the crux of Harrington's duties as a Field Service Account Manager is the oversight of CSRs and regional field service operations. In this capacity, Harrington (in Despatch's view) is required to exercise judgment and discretion by assisting individual customers in weighing purchase options, in matching the appropriate CSR to customer accounts, and in acting as the liaison between the CSRs and Despatch.

Harrington, on the other hand, maintains that his elevation in title from Field Service Engineer to Field Service Account Manager involved no change in his job responsibilities and was undertaken to place him in a higher pay bracket because he had "maxed out" of the pay scale for Field Service Engineers. Harrington notes that his utilization goal was increased from 65 percent to 69 percent *after* the change in job titles. Harrington acknowledges that as a loyal employee he promoted service agreements, introduced CSRs to customers, and did whatever [*9] he could to keep customers happy. However, in Harrington's view, these functions were ancillary to his primary role as a service technician, because the best way to build customer relationships is "to keep the equipment running." Harrington told Despatch that assuming increased administrative duties was "not doable" because of the physical demands of his job. Harrington denies having any supervisory authority over the CSRs and notes that prior to the filing of the lawsuit, Despatch did not hold him responsible for CSR performance. In conducting Harrington's 2001 annual review, Despatch checked off the rating category for "Work Supervision/Management" as "Not Applicable," and left the box blank during Harrington's June 2002 review.

An exemption is determined by an employee's actual duties, and not by his title or the employer's formal description of his job. *29 C.F.R. § 541.201 (b)*; see also *Ale v. TVA, 269 F.3d 680, 688-689 (6th Cir. 2001)*. That is the case here. However imposing Harrington's title, the record does not support the argument that Harrington has the authority to make discretionary decisions, large or [*10] small, or that he has any actual supervisory powers over the CSRs (other than scheduling their initial visits to customer sites). The FLSA administrative exemption therefore does not apply.

2. The Motor Carrier Act Exemption

The MCA was enacted in 1935 "to promote efficiency, economy, and safety in the rapidly burgeoning motor transportation industry." *Friedrich v. U.S. Computer Services, 974 F.2d 409, 412 (3rd Cir. 1992)*. The MCA "vested in the Interstate Commerce Commission power to establish reasonable requirements with respect to qualifications and maximum hours of service of employees and safety of operation and equipment of common and contract carriers by motor vehicle." *Levinson v.*

*Spector Motor Service, 330 U.S. 649, 658, 91 L. Ed. 1158, 67 S. Ct. 931 (1947).* The FLSA wage and hour standards were enacted three years after the MCA with an exception for employees over "whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of [the MCA]." *29 U.S.C. § 213(b)(1).*

In making an exception, Congress's purpose was to avoid a jurisdictional conflict between the Secretary of Labor [*11] and the Secretary of Transportation by giving precedence to the MCA as a public safety statute. See *Levinson, 330 U.S. at 662* ("It remains for us to give full effect to the [MCA's] safety program to which Congress has attached primary importance, even to the corresponding exclusion by Congress of certain employees from the benefits of the compulsory overtime pay provisions of the Fair Labor Standards Act."). Thus, if the MCA exemption applies to Harrington's employment, the fact that he is not an exempted employee for FLSA purposes is of no relevance.

The Secretary of Transportation need not actually exert power over an employee for jurisdiction to attach. "It is the existence of the power as opposed to its exercise which Congress has said is determinative. . . ." *Morris v. McComb, 332 U.S. 422, 434, 92 L. Ed. 44, 68 S. Ct. 131 (1947).* Under the MCA, the Secretary of Transportation is authorized to prescribe "qualifications and maximum hours of service of employees of and standards of equipment of, a motor private carrier, when needed to promote safety of operation." *49 U.S.C. § 31502(b)(2).* A "motor private carrier" n5 is defined as

[a] person, [*12] other than a motor carrier, transporting property by motor vehicle when:

(A) the transportation [involves interstate commerce];

(B) the person is the owner, lessee, or bailee of the property being transported; and

(C) the property is being transported for sale, lease, rent, or bailment, or to further a commercial enterprise.

n5 One would think that Congress meant "private motor carrier," but the term is one of art rather than description.

*49 U.S.C. § 10102(16).* To fall under the regulatory jurisdiction of the Secretary of Transportation, an employee must be:

(1) employed by carriers whose transportation of passengers or property by motor vehicle is subject to his jurisdiction under section 204 of the Motor Carrier Act . . .; and

(2) engage[d] in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within [*13] the meaning of the MCA.

*29 C.F.R. § 782.2(a).* "Highway transportation by motor vehicle from one State to another, in the course of which the vehicles cross the State line, clearly constitutes interstate commerce under both [the FLSA and the MCA]. Employees of a carrier so engaged, whose duties directly affect the safety of operation of such vehicles, are within the exemption. . . ." *29 C.F.R. § 782.7(b)(1).*

Despatch qualifies as a motor private carrier because Harrington operates a vehicle in interstate commerce, is the bailee of property (tools and spare parts) owned by Despatch that are transported in commerce for the purpose of furthering a commercial enterprise (servicing Despatch's industrial ovens). See *49 U.S.C. § 10102(16).* Thus, if some portion of Harrington's job duties impact the safety of interstate motor transportation, the MCA exemption applies and Harrington is ineligible for overtime. See *Crooker v. Sexton Motors, Inc., 469 F.2d 206, 209 (1st Cir. 1972),* citing *Pyramid Motor Freight Corp. v. Ispass, 330 U.S. 695, 708, 91 L. Ed. 1184, 67 S. Ct. 954 (1947)* ("It is obvious that [*14] one who drives a vehicle in interstate commerce directly affects the safety of such operations as long as he is driving.").

Harrington contends that Despatch is not a motor private carrier under the MCA because the tools and spare parts carried in his van are not the type of property contemplated by the statute. In addition, he argues that the transportation of tools and spare parts was not the "primary purpose" of his travel, but ancillary to the more vital purpose of transporting Harrington himself to the customer site. Harrington urges the adoption of the reasoning of *Reich v. New Mt. Pleasant Bakery, Inc., 1993 U.S. Dist. LEXIS 12937, 1993 WL 372270 *5 (N.D.N.Y. Sept. 13, 1993),* a district court case holding that the MCA exemption does not apply when transportation is not the primary business of the employer. However, the

overwhelming majority of cases disagree. In *Friedrich v. U.S. Computer Services, 974 F.2d 409 (3d Cir. 1992)*, the seminal case on the subject, the Third Circuit found that a thirty-five pound tool box and related parts and equipment constituted "property" within the meaning of the MCA, and that field engineers who carried such tools and parts in interstate commerce [*15] were exempt employees. *Id. at 419.* See also *Harshman v. Well Service, Inc., 248 F. Supp. 953, 958 (W.D. Pa. 1964)* (tools and equipment carried on trucks are "property" for MCA exemption purposes); *Sinclair v. Beacon Gasoline Co., 447 F. Supp. 5, 11 (W.D. La. 1976)* (same). See also *Peraro v. Chemlawn Services Corp., 692 F. Supp. 109, 114 (D. Conn. 1988)* (trucks equipped to provide interstate carpet cleaning services are MCA-exempted).

Harrington's argument that the transportation of tools and spare parts is not the "primary purpose" of his interstate travel is a reference to the "primary business test" set out in *49 U.S.C. § 13505* (formerly § 10524(a)), which precludes ICC jurisdiction over the transportation of property by a person engaged in a non-transportation business when such transportation is within the scope and furthers that person's primary business. The same argument was made and rejected in *Friedrich.* The court held that section 10524(a) was inapplicable because its purpose is simply to relieve motor private carriers of burdensome ICC licensing, permit, and certificate [*16] requirements. *Friedrich, 974 F.2d at 413.* The *Friedrich* holding has since been adopted by the Courts of Appeals for the Ninth and Second Circuits. See *Klitzke v. Steiner Corp., 110 F.3d 1465, 1469 (9th Cir. 1997)* ("[Despite § 10524(a), there are] no limitations on the Secretary's power to prescribe safety requirements for employees of motor private carriers."); *Bilyou v. Dutchess Beer Distributors, Inc., 300 F.3d 217, 226 (2d Cir. 2002)* ("That part [§ 10535] contains provisions authorizing the DOT to enact registration and security (insurance and bonding) requirements for motor carriers, freight forwarders, and brokers. . . . *Section 13505* has no bearing on the Secretary's power, as described in *29 U.S.C. § 213(b)(1)*."). See also *McGuiggan v. CPC Int'l, Inc., 84 F. Supp. 2d 470, 482 (S.D.N.Y. 2000); Carpenter v. Pennington Seed, Inc., 2002 U.S. Dist. LEXIS 5808, 2002 WL 465176 at *4 (E.D. La. Mar. 26, 2002)*. I see no reason to part with the majority.

Harrington argues that even if Despatch is a motor private carrier, the MCA exemption is inapplicable to his case because his connection with interstate [*17] commerce is *de minimis*. n6 Although Harrington cites extra-circuit authority that is supportive of his argument, the First Circuit has squarely rejected the idea of a *de minimis* exception to the MCA. See *Crooker, 469 F.2d at 210* ("[While the *de minimis* exception may apply to those whose activities do not directly affect safety], the activi-

ties of one who *drives in interstate commerce, however frequently or infrequently*, are not trivial. Such activities directly affect the safety of motor vehicle operations."). (Emphasis added). "It is the *character* of the activities rather than the *proportion* of either the employee's time or his activities that determines the actual need for the Commission's power to establish reasonable requirements with respect to qualifications, maximum hours of service, safety of operation and equipment." *Levinson, 330 U.S. at 674-675. (Emphases added)*.

n6 Harrington worked a total of 7,667 hours over the relevant three year period. Only 231 hours, or three percent of his time, was spent actually operating a vehicle in interstate commerce.

[*18]

Finally, Harrington argues that if the MCA exemption is in play, Crooker's week-by-week analysis should be applied. In *Crooker*, the plaintiff was an employee of a New Hampshire car dealership. His primary job was to clean and polish new cars. On occasion, he would be asked to deliver or pick up a car in Massachusetts. The First Circuit held that the "continuing duties" of Crooker's job did not include driving in interstate commerce, and that he was therefore entitled to overtime for the weeks in which no such driving occurred. See *Crooker, 469 F.2d at 211.* In so ruling, the First Circuit relied on a DOL regulation: n7 "If in particular workweeks other duties are assigned to [the employee] which result, in those workweeks, in his performance of activities directly affecting the safety of operation of motor vehicles in interstate commerce on the public highways, the exemption will be applicable to him in those workweeks, but not in the workweeks when he continues to perform the duties of the non-safety affecting job." *Crooker, 469 F.2d at 210*, citing *29 C.F.R. § 782.2(b)(3)*.

n7 While the regulation is not binding on the Secretary of Transportation, it is often cited by courts in a Crooker context.

[*19]

Harrington's employment is distinguishable. One of the "continuing duties" of Harrington's job is to drive the van to perform maintenance work for Despatch's customers anywhere in New England. Interstate travel, unlike the case in *Crooker*, is an integral part of Harrington's job, the frequency of which will increase as Despatch's customer base in New England grows. Thus, the week-by-week *Crooker* analysis is inapplicable. See

Case 1:04-cv-12465-MLW    Document 18    Filed 10/12/2005    Page 15 of 24

Page 6
2005 U.S. Dist. LEXIS 12781, *

*Gerard v. Northern Transportation, LLC, 146 F. Supp. 2d 63, 67 (D. Me. 2001)*, citing *29 C.F.R. § 782.2(b)(3)*, which provides:

> if the bona fide duties of the job performed by the employee are in fact such that he is . . . called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities . . ., he comes within the exemption in *all* workweeks when he is employed at such job.
>
> This general rule assumes that the activities involved in the continuing duties of the job in all such workweeks will include activities which have been determined to affect directly the safety of operation of motor vehicles on the public highways in transportation in [*20] interstate commerce. Where this is the case, the rule applies regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek, and the exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting "safety of operation."

*29 C.F.R. § 782.2(b)(3)*. Because in the ordinary course of his work, Harrington is called upon to drive in inter-state commerce, *29 C.F.R. § 782.2(b)(3)* applies and Harrington is an MCA-exempt employee. See *Guyton v. Schwan Food Co., 2004 U.S. Dist. LEXIS 4174, 2004 WL 533942 *6 (D. Minn. 2004)* (sales managers who drive delivery trucks in interstate commerce "from time to time," although not every week, fall within the MCA exemption because their activities directly affect motor vehicle safety); *Carpenter v. Pennington Seed, Inc., 2002 U.S. Dist. LEXIS 5808, 2002 WL 465176 *4 (E.D. La. 2002)* (same). n8

> n8    The relevant exemptions under the MFWL are identical to those under the FLSA, *29 U.S.C. § 207(a)(1)*, and the same analysis applies. See *Valerio v. Putnam Assocs., Inc., 173 F.3d 35, 40 (1st Cir. 1999)*. However, because the federal MCA preempts any contrary result under the MFWL, the statute is no more availing to Harrington than is the federal FLSA.

[*21]

ORDER

For the foregoing reasons, Despatch's motion for summary judgment is ALLOWED. Because Harrington is an MCA-exempt employee, his motion for summary judgment is MOOT. The Clerk will enter judgment for Despatch.

SO ORDERED.

Richard G. Stearns UNITED STATES DISTRICT JUDGE

# EXHIBIT B

Edwin James Bittner                                  08/10/2005

74

| 10:56:19 | 1 | Q. Who was Dennis Nilan? |

10:56:24   2        (Witness pointing to Dennis Nilan.)

10:56:25   3    Q.  Describe who he is for the record.

10:56:27   4    A.  He was the service manager for Optos.

10:56:31   5    Q.  So Dennis Nilan got ahold of you.  And what

10:56:35   6  happened from there?

10:56:38   7    A.  He flew to Seattle, interviewed I believe he

10:56:43   8  said ten people.  He chose me to fly back to Boston

10:56:48   9  for an interview.  I interviewed with several people

10:56:52  10  in Boston.  He made the offer and he hired me.

10:56:57  11    Q.  Did Dennis Nilan or anyone else in the

10:56:59  12  course of the interviewing process question whether

10:57:03  13  you had the job skills and the experience for the

10:57:05  14  job?

10:57:07  15    A.  They did.

10:57:09  16    Q.  And what were the questions that were raised

10:57:14  17  with you in that regard?

10:57:15  18    A.  I don't recall.

10:57:22  19    Q.  You obviously overcame those concerns?

10:57:25  20    A.  I believe so.

10:57:26  21    Q.  What job were you interviewing for?

10:57:29  22    A.  Field service engineer.

10:57:31  23    Q.  And what were you made to believe the

10:57:32  24  responsibilities of a field service engineer were

Edwin James Bittner                                    08/10/2005

75

| | | |
|---|---|---|
| 10:57:35 | 1 | going to be? |
| 10:57:35 | 2 | A.  Installation, service, maintenance, |
| 10:57:39 | 3 | calibration, updating of the Panoramic 200, the |
| 10:57:44 | 4 | product line including the Panoramic 200, customer |
| 10:57:48 | 5 | relations, customer interfacing.  I was sent once to |
| 10:57:54 | 6 | Phoenix for a customer that was extremely irritated |
| 10:58:00 | 7 | with us to resolve a situation. |
| 10:58:03 | 8 | Q.  Now, were you advised during the hiring |
| 10:58:07 | 9 | process what geographic territory you were going to |
| 10:58:10 | 10 | work in? |
| 10:58:11 | 11 | A.  Pacific Northwest. |
| 10:58:14 | 12 | Q.  Was that defined for you during the |
| 58:16 | 13 | interviewing process? |
| 10:58:17 | 14 | A.  It was not. |
| 10:58:18 | 15 | Q.  At some point was your territory defined for |
| 10:58:22 | 16 | you? |
| 10:58:22 | 17 | A.  Several times. |
| 10:58:24 | 18 | Q.  When was that? |
| 10:58:25 | 19 | A.  I don't remember the dates. |
| 10:58:30 | 20 | Q.  Prior to your first day of work, did Optos |
| 10:58:33 | 21 | clarify for you the parameters of the Pacific |
| 10:58:38 | 22 | Northwest territory? |
| 10:58:38 | 23 | A.  No. |
| 10:58:39 | 24 | Q.  When did you first learn the parameters of |

Edwin James Bittner                          08/10/2005

76

10:58:41  1    the Pacific Northwest territory?

10:58:43  2        A.  Probably three or four months into the job.

10:58:56  3        Q.  So the first three or four months, what

10:58:58  4    territory did you work?

10:59:02  5        A.  I was all over the West Coast.  I went to I

10:59:07  6    believe it was Mississippi or Georgia.  I came back

10:59:14  7    to Boston once to do an install back here.  I did a

10:59:23  8    lot of travel.

10:59:24  9        Q.  And three or four months into the job your

10:59:28  10   territory was finally defined for you?

10:59:31  11       A.  Yes.

10:59:32  12       Q.  Who did that?

59:34  13       A.  Mr. Nilan.

10:59:36  14       Q.  What did Dennis Nilan tell you three or four

10:59:38  15   months into your job the parameters of your

10:59:41  16   territory were going to be?

10:59:43  17       A.  I believe at the time it was Northern

10:59:47  18   California, Oregon.  I had Utah, Wyoming, Montana,

10:59:58  19   Washington State and any installs going into Canada.

11:00:05  20       Q.  Prior to Mr. Nilan telling you three or four

11:00:12  21   months into the job these specific parameters --

11:00:18  22   well, strike that.  Did the parameters that Mr.

11:00:22  23   Nilan set out for you three or four months into the

11:00:25  24   job surprise you in any way?

Edwin James Bittner

08/10/2005

78

| | | |
|---|---|---|
| 11:02:09 | 1 | A.   Only due to the workload. |
| 11:02:12 | 2 | Q.   Did you express any concern to Dennis Nilan |
| 11:02:14 | 3 | about including Canada in your territory? |
| 11:02:19 | 4 | A.   I did. |
| 11:02:22 | 5 | Q.   And was this at the time he set out the |
| 11:02:26 | 6 | parameters of the territory for you? |
| 11:02:33 | 7 | A.   I don't remember.  I don't recall right now. |
| 11:02:37 | 8 | Q.   What did you tell Mr. Nilan about your |
| 11:02:41 | 9 | concerns with respect to the parameters of the |
| 11:02:45 | 10 | territory? |
| 11:02:48 | 11 | A.   I told him I could not keep up. |
| 11:02:54 | 12 | Q.   What did you mean by that? |
| 02:58 | 13 | A.   I mean it was too much work to go from |
| 11:03:01 | 14 | Montana to Oregon to Canada in one day and still try |
| 11:03:06 | 15 | to get seven hours sleep.  The area was physically a |
| 11:03:12 | 16 | very large area with a large number of machines that |
| 11:03:17 | 17 | required a lot of maintenance. |
| 11:03:21 | 18 | Q.   How did Mr. Nilan respond? |
| 11:03:24 | 19 | A.   He took away Utah, Wyoming, Northern |
| 11:03:34 | 20 | California and Southern Oregon. |
| 11:03:36 | 21 | Q.   Leaving you with what? |
| 11:03:37 | 22 | A.   Montana, Northern Oregon, Washington and |
| 11:03:43 | 23 | Canada and Idaho. |
| 11:03:53 | 24 | Q.   Did you approve of this realignment of your |

Edwin James Bittner

08/10/2005

79

| Time | Line | Text |
|------|------|------|
| 11:03:58 | 1 | territory? |
| 11:03:59 | 2 | A.  It was better, yes. |
| 11:04:05 | 3 | Q.  Did the realignment of the territory address |
| 11:04:08 | 4 | your concerns? |
| 11:04:09 | 5 | A.  It did. |
| 11:04:10 | 6 | Q.  And did you find the realignment now meant |
| 11:04:13 | 7 | that you could keep up? |
| 11:04:19 | 8 | A.  It was still too much work for one field |
| 11:04:21 | 9 | engineer, but it's all we had to work with.  Optos |
| 11:04:30 | 10 | told us we were going to get another field engineer |
| 11:04:32 | 11 | on the West Coast.  They had been saying that for |
| 11:04:36 | 12 | the previous year for almost the entire time that I |
| 04:41 | 13 | had been there.  We were told that we were to have |
| 11:04:43 | 14 | somebody else based in Oregon.  At that time there |
| 11:04:47 | 15 | were only two field engineers on the West Coast, |
| 11:04:53 | 16 | myself and Ray Poklacki. |
| 11:04:58 | 17 | Q.  So you no longer believed Optos's |
| 11:05:01 | 18 | representations that they were going to hire |
| 11:05:05 | 19 | somebody to cover Canada? |
| 11:05:07 | 20 | MR. WILGOREN:  Objection. |
| 11:05:08 | 21 | A.  That's not true.  I knew eventually they |
| 11:05:12 | 22 | would. |
| 11:05:13 | 23 | Q.  You just didn't know when? |
| 11:05:14 | 24 | A.  Correct. |

Edwin James Bittner                                    08/10/2005

175

| 13:58:27 | 1 | A.  I loved Optos, very good company.  Outside |
| 13:58:35 | 2 | of Mr. Nilan it was a very, very good position.  I |
| 13:58:38 | 3 | liked the company an awful lot. |
| 13:58:39 | 4 | Q.  Well, you testified today that you were |
| 13:58:42 | 5 | working a minimum of 80 hours a week and constantly |
| 13:58:45 | 6 | traveling? |
| 13:58:46 | 7 | A.  I don't believe I said a minimum of 80 hours |
| 13:58:48 | 8 | a week.  I was traveling almost constantly, yes. |
| 13:58:51 | 9 | Q.  How many hours a week were you working? |
| 13:58:55 | 10 | A.  Different every week.  I don't think I could |
| 13:58:58 | 11 | put a number exactly because it wasn't the same |
| 13:59:00 | 12 | every week.  It probably averaged 60 to 70. |
| 59:04 | 13 | Q.  So you were working hard and traveling most |
| 13:59:06 | 14 | of the time, correct? |
| 13:59:06 | 15 | A.  That's correct. |
| 13:59:07 | 16 | Q.  It was keeping you away from your wife, |
| 13:59:09 | 17 | correct? |
| 13:59:09 | 18 | A.  That's correct. |
| 13:59:10 | 19 | Q.  Now, you had a child you were hoping was a |
| 13:59:12 | 20 | permanent placement, right? |
| 13:59:13 | 21 | A.  That's right. |
| 13:59:14 | 22 | Q.  You knew if you stayed with Optos that you |
| 13:59:16 | 23 | were going to be on the road during the weekdays |
| 13:59:19 | 24 | just about all the time, right? |

Edwin James Bittner                          08/10/2005

302

| | | |
|---|---|---|
| 16:56:24 | 1 | A. I did. |
| 16:56:25 | 2 | Q. Tell us what happened with respect to that |
| 16:56:28 | 3 | issue. |
| 16:56:28 | 4 | A. Well, I have a big Dodge truck and I had a |
| 16:56:31 | 5 | lot of parts in the back of my truck for |
| 16:56:35 | 6 | troubleshooting the equipment. As all field |
| 16:56:39 | 7 | engineers do it's called a trunk kit. And because |
| 16:56:43 | 8 | I'm the only one that consistently went across the |
| 16:56:46 | 9 | border, I requested to have a separate trunk kit put |
| 16:56:49 | 10 | in Canada because I was supposed to, legally I have |
| 16:56:52 | 11 | to claim, all my parts as I go across I had to |
| 16:56:59 | 12 | declare everything. And Dennis told me on a couple |
| 57:05 | 13 | of different occasions, no, don't worry about it; |
| 16:57:08 | 14 | just do it; nobody cares; nobody's going to care |
| 16:57:11 | 15 | about anything. I think on the fourth or fifth time |
| 16:57:14 | 16 | going across I got caught and I was detained. |
| 16:57:17 | 17 | Q. Detained by whom? |
| 16:57:18 | 18 | A. Canada. Canadian officials. |
| 16:57:21 | 19 | Q. And what happened as a result of that? |
| 16:57:23 | 20 | A. I lost my Nexus privileges. I'm not allowed |
| 16:57:29 | 21 | personally back into Canada unless I stop in and |
| 16:57:32 | 22 | check in. |
| 16:57:36 | 23 | Q. Is it your testimony that based on |
| 16:57:38 | 24 | instructions you received from Mr. Nilan, you did |

Edwin James Bittner                                08/10/2005

304

| | | |
|---|---|---|
| 16:58:51 | 1 | A.  Yes, sir. |
| 16:58:51 | 2 | Q.  And calling your attention to the first |

16:59:00    3    page, did you read the first couple lines of the

16:59:04    4    paragraph under No. 1 in the middle of the page?

16:59:07    5    A.  "Jay's major accountabilities as a Field

16:59:10    6    Service Engineer are providing professional, quality

16:59:13    7    and timely customer support to customers including

16:59:16    8    but not limited to on-site installations,

16:59:18    9    preventative maintenance, repairs and upgrades to

16:59:21    10    the satisfaction of the customer."

16:59:23    11    Q.  Okay, that's fine.  Read the next paragraph.

16:59:25    12    A.  "Jay was instrumental in helping resolve a

59:28    13    customer situation in Phoenix, Arizona.  The

16:59:30    14    customer was upset with Optos and the instrument

16:59:32    15    performance.  Jay was able to diagnose problem and

16:59:41    16    repair instrument to customers satisfaction."

16:59:41    17    Q.  Calling your attention to the third page

16:59:47    18    under Competency Assessment and Explanation.  Can

16:59:53    19    you read the provision where you got an effective

16:59:59    20    mark on Customer Focus?

17:00:01    21    A.  "Constantly focuses efforts to satisfy

17:00:05    22    external customer requirements.  Jay has fair degree

17:00:08    23    of respect with the internal customer team but needs

17:00:12    24    to work on improving."